**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | **Case No. 16-cr-140** |
| **Plaintiff,** | : | |
| | : | **JUDGE ALGENON L. MARBLEY** |
| **v.** | : | |
| | : | **Magistrate Judge Jolson** |
| **MARTIN IVAN PACHECO-ALVAREZ,** | : | |
| | : | |
| **Defendant.** | : | |

## OPINION & ORDER

This is a story about law-enforcement officers who take shortcuts in their zeal to make arrests and the Fourth and Fifth Amendments to the United States Constitution, which prohibit them from doing so.

The defendant, Martin Ivan Pacheco-Alvarez, was entitled to *Miranda* warnings before immigration officers interrogated him on the side of the highway.  Their failure to provide those warnings requires suppression of any statements he made about his immigration status.  Pacheco's warrantless arrest, which was not supported by probable cause, also requires suppression of derivative evidence the officers later discovered concerning Pacheco's possession of firearms.  For these reasons, the Court **GRANTS** Pacheco's motion to suppress evidence.

## I.  BACKGROUND[1]

In April 2016, a special agent with United States Immigration and Customs Enforcement ("ICE") received a tip that Pacheco, a Mexican national, was dealing cocaine and firearms in Ohio.  (Doc. 40, PageID 161).  According to Agent Myers, an informant saw Pacheco carrying drugs and guns several times and heard him "brag" about selling both.  (Doc. 41, PageID 459).

---

[1] The Court draws all facts from a suppression hearing held on October 25-26, 2016.

The informant provided Pacheco's name, address, and photo to Agent Myers (*id.* at 455-56), and also claimed that Pacheco was living in the United States unlawfully (Doc. 40, PageID 165).

At first, Agent Myers testified that he viewed this information as highly credible:

| | |
|---|---|
| THE COURT: | And I take it this was a confidential source with whom you had dealt before? |
| [MYERS]: | With whom I—Enforcement Removal Operations had dealt with before. |
| THE COURT: | In other words, this is a source who, in your experience as an agent for ICE, you would have relied upon, is that right? |
| [MYERS]: | Yes, Your Honor. |
| THE COURT: | Did the confidential source give you information which you believe was correct and accurate? |
| [MYERS]: | Yes, Your Honor. |

(Doc. 41, PageID 455).  Agent Myers, therefore, had several options.

*First*, he could have sworn out an affidavit and taken the information to a magistrate judge to obtain a search warrant.  Law-enforcement officers *may*, depending on their relationship with an informant, obtain a valid search warrant without further corroboration or evidence. *See United States v. Allen*, 211 F.3d 970, 976 (6th Cir. 2000) (en banc).  Depending on the contents of the affidavit, the magistrate might have issued a warrant, and Agent Myers could have been on his way to search Pacheco's residence.  At the very worst, the magistrate would have told Agent Myers that he needed more evidence before obtaining a warrant, thus fulfilling the central promise of the Fourth Amendment by placing a neutral judge between the overwhelming (and sometimes overzealous) power of the government and the liberty interests of the individual.  *See Johnson v. United States*, 333 U.S. 10, 14 (1948) (explaining purpose behind warrant requirement and the need for judges to make those decisions).

*Alternatively*, if, as Agent Myers later testified, he harbored doubts about the accuracy of his informant's tip or the likelihood of obtaining a warrant (Doc. 41, PageID 456-57), he could have gone to the United States Attorney's Office to determine what additional steps he should take. That office could have informed him that more investigative work, like "police surveillance" which showed "heavy traffic around [Pacheco's] residence" might "corroborate[] the informer's information sufficiently to find probable cause." *See United States v. Williams*, 224 F.3d 530, 533 (6th Cir. 2000). Or that the best course would be to arrange a "controlled buy" at Pacheco's home—whether from this confidential informant or, if the informant was too reluctant, from someone else.[2] *See United States v. Ray*, 803 F.3d 244, 277 (6th Cir. 2015). After all, Agent Myers testified that Pacheco was "selling [cocaine and] firearms to gang members and other people around town." (Doc. 41, PageID 459).

*Finally*, Agent Myers could have performed some, or all, of this routine investigative work himself, without first applying for a warrant or contacting the U.S. Attorney's Office. American history and pop-culture are filled with examples of law-enforcement agents doing the gritty but necessary legwork to build their cases. Eliot Ness, the Treasury Agent who brought down Al Capone, exemplified this dogged, upright police work. And fictionalized heroes like Joe Friday, Starsky and Hutch, and Crockett and Tubbs come to mind too. At bottom, a special agent with Myers's years of training and experience surely should have recognized that he had options when it came to establishing probable cause necessary to obtain a search warrant.

---

[2] THE COURT:     Is there any reason in the weeks leading up to this April 22nd stop that you did not have your confidential informant execute a controlled buy of either cocaine or drugs?

  [MYERS]:     Absolutely, Your Honor. The confidential source told me and—told me specifically that he was afraid of Mr. Pacheco and wanted as little involvement as possible. He said [Pacheco] had an array of weapons and he was scared of him.

(Doc. 41, PageID 473).

Agent Myers, however, took none of these steps in his quest to nab Pacheco.  He did not apply for a search warrant.  (*Id.* at 456-58).[3]  He did not ask the U.S. Attorney's Office for advice.  And he did not conduct any additional investigative work with an eye toward establishing probable cause to obtain a warrant.  (*Id.* at 479).[4]  Instead, Agent Myers orchestrated a dizzying chain of events more befitting an "issue-spotting" exam question for law students than old-fashioned police work.  The Court will recount those events below.

### A.  The Warrantless Traffic Stop

Things began simply enough the morning of April 22, 2016.  Pacheco, who is a painter by trade, met up with his neighbor, Gerardo Marroquin Perez ("Marroquin"), and Gerardo's brother, Hugo, to head to work for the day.  (*Id.* at 390-91).  The three men piled into Marroquin's white work van just outside Pacheco's house.  (*Id.* at 390-91, 440-41).  Unbeknownst to any of them, Agent Myers was watching from nearby.  (Doc. 40, PageID 161 ("I—with a few other investigators, including uniform[ed] officers, set up on Mr. Pacheco's house and conducted surveillance to watch him depart his house that day.")).

---

[3] THE COURT:   Now, was it your understanding, then, that the only way that you were going to be able to nab Mr. Pacheco-Alvarez was to seize either drugs first or guns first?  Was that your understanding?

 [MYERS]:   Yes, Your Honor.

(*Id.* at 458).

[4] [MUCHNICKI]:   So you had the opportunity to conduct a stakeout of the residence to perhaps confirm what your informant did, but you never took that step, correct?

 [MYERS]:   Well, at that—

 [MUCHNICKI]:   You never took that step, correct?

 [MYERS]:   I couldn't because I had to get the manpower to do it. . . .

(*Id.* at 479).

Although Agent Myers testified that he could not arrange for surveillance of Pacheco's home in connection with seeking a warrant, he did arrange for a small task force the morning of April 22nd, all for the purpose of initiating a warrantless traffic stop that would net the same result, but without any judicial oversight. (Doc. 41, PageID 479-80).[5] That task force consisted of ICE Agent Myers and Deportation Officer Matt Salmon, as well as Franklin County Sheriff's Deputies Johnathan Stickel and Robert McKee. (Doc. 40, PageID 170-71, 269-70, 274-75).

Agent Myers, who positioned himself outside Pacheco's home, notified the deputies that he suspected Pacheco was dealing drugs and firearms, and he relayed to them that Pacheco was traveling in a white Chevy work van bearing Ohio license plate number "GPA 3756." (*Id.* at 275-76). The deputies, who were waiting nearby, ran that plate and discovered that it was registered to a two-door Honda coupe, and not a Chevy van. (*Id.* at 162, 275-76).

Bingo. When Agent Myers learned that the license plate displayed on the van did not match its registration, he telephoned the deputies and directed them to initiate a traffic stop. (*Id.* at 168-70 (agreeing that he "had [Pacheco] stopped" for four reasons: (1) "the license plate"; (2) "he might have a gun"; (3) "he might be illegally in the country"; and (4) "he might be dealing cocaine")).

---

[5] [MYERS]:   I couldn't [conduct a stakeout] because I had to get the manpower to do it. . . .

[MUCHNICKI]: Did you submit a request for the manpower to do the stakeout?

[MYERS]:   We have certain people we work with. I work around people's schedules. Yes, in a sense, I did. I had to get a group of people together when they were available. On top of that, even if I had done as you call a stakeout or surveillance, that may not necessarily have proved anything. For the probable cause, I really would have had to have done controlled buys, and I didn't have a source at that point that was willing to do that. So that was not an option for me. Therefore, the way I handled it was what I felt to be the only option at that point.

[MUCHNICKI]: Which is the stop—stopping the van?

[MYERS]:   Yes.

After receiving their orders from Agent Myers, Deputies Stickel and McKee stopped the van just a few minutes later, at 6:51 a.m. (*Id.* at 276). Agent Myers and Officer Salmon arrived roughly one minute later. (*Id.* at 163). Deputy Stickel approached the van and spoke with the driver, Marroquin. (*Id.* at 277-78). Agent Myers also approached the van and saw Marroquin, his brother Hugo, and Pacheco. (*Id.* at 163-64). Deputy Stickel asked Marroquin for his driver's license, but he replied that he did not have one. (*Id.* at 278). Deputy Stickel removed Marroquin from the van and took him to one of the sheriff's cruisers for further identification. (*Id.* at 277).[6] Agent Myers and Officer Salmon then asked both passengers to depart the vehicle so that they could "address immigration concerns." (*Id.* at 164).

## B. Pacheco's Roadside Detention and Pre-*Miranda* Questioning

Without providing any *Miranda* warnings, the ICE officers began investigating Pacheco's status as a suspected unlawful alien. (*Id.* at 171-73). Officer Salmon collected a set of fingerprints from Pacheco and ran them through a federal immigration database. (*Id.* at 171-73). Pacheco's record indicated that he was denied an immigration application in 2004 and that there was "no further paperwork in the system showing that he had any kind of legal status." (*Id.* at 171). The officers then began questioning Pacheco about his status. (*Id.*). Pacheco presented a Mexican consular ID card and admitted that he was born in Mexico and did not have any documentation that would allow him to reside in the United States. (*Id.* at 171, 210-12, 297). Agent Myers decided to "detain" Pacheco due to the lack of paperwork and his admissions that he was here unlawfully. (*Id.* at 172-73). Agent Myers later discovered that the second passenger, Hugo, also was unlawfully in the United States. (*Id.* at 205). At this point, roughly twenty minutes had elapsed from the beginning of the traffic stop. (*Id.* at 174).

---

[6] At some point during the traffic stop, Agent Myers recognized Marroquin from an earlier investigation and prosecution for passport fraud and identity theft. (*Id.* at 164).

Upon learning that Pacheco and Hugo were in the United States unlawfully, Agent Myers decided to keep both men in custody.  (*Id.* at 206-07).  At some point during the traffic stop and questioning (the record is not clear on this point), Pacheco was placed in the back of Deputy Stickel's cruiser along with Marroquin, while Hugo was placed in the back of Officer Salmon's vehicle due to space constraints in Deputy McKee's cruiser.  (*Id.* at 279-80).

## C.  The Warrantless Vehicle Search

After Agent Myers and Officer Salmon determined that all of the vehicles' occupants were in the United States unlawfully, they decided to detain Pacheco and Hugo for their immigration violations, while letting the driver go, since he already faced removal proceedings for an earlier immigration violation but had not violated his bond through the minor traffic violation.  (*Id.* at 208).  Contemporaneously with these events, Agent Myers asked Deputy McKee to run his drug-dog, "Blek," around the vehicle to detect any narcotics.  (*Id.* at 165, 270).  "Blek" then alerted to the presence of narcotics within the van.  (*Id.* at 165, 270).  Accordingly, the officers conducted a full vehicle search.  (*Id.* at 165, 207).  Despite the informant's tip that Pacheco was dealing cocaine, and despite "Blek's" supposed hit on the van, the officers could not find any drugs.  (*Id.* at 165, 270-71).  This search occurred without a warrant or any judicial oversight.

## D.  Pacheco's Continued Detention and a Curious Detour Back to His Residence

Agent Myers testified that, based on his understanding of immigration law, he was permitted to "detain" Pacheco for up to forty-eight hours of further investigation given his responses to the immigration questioning during the traffic stop.  (*Id.* at 208-12).  During that time period, Agent Myers would—in theory—"go back to the office and do [his] records check" to "determine [Pacheco's] status."  (*Id.* at 212).

7

Agent Myers, however, did not want to take Pacheco back to the station for further investigation of his immigration status—at least not yet. (*Id.* at 213, 227). Instead, Agent Myers persisted in his belief that Pacheco "was dealing drugs and guns," and he wanted to prove it, warrant or no warrant. (*Id.* at 213, 227). So Agent Myers opted to take a detour back to Pacheco's home, under the hope that he could persuade Pacheco into consenting to a warrantless search of his residence:

> THE COURT: And at the time [of Pacheco's detention], what you had with respect to him was not any evidence that he committed any additional crimes at the scene, right?
>
> [MYERS]: Yes, Your Honor.
>
> THE COURT: The only thing that you had was your knowledge from a confidential informant that he was dealing drugs and guns?
>
> [MYERS]: Yes, Your Honor.
>
> THE COURT: And so that's why you wanted to take him back to his apartment to determine whether he was, in addition to being here wrongfully, dealing drugs and guns?
>
> [MYERS]: Yes, Your Honor.
>
> . . .
>
> THE COURT: So one final question. . . . Once he was under detention, why didn't you just take him back to the station as you would if you arrested somebody for an offense? You wouldn't take them back home. You would take them to the police station. Why didn't you take him back to the station?
>
> [MYERS]: I wanted to have the opportunity to ask him to do a consent search on his residence. And I knew if I did that, that I would want him there for that process at all times so that way if he wanted to withdraw consent, he could do that.
>
> THE COURT: Okay. And under an arrest scenario where you take a defendant to the station, you can also get a warrant at the station, can't you?

| | | |
|---|---|---|
| [MYERS]: | Yes, Your Honor. | |
| THE COURT: | In your experience[,] when you get a warrant, you don't have to get a defendant's consent, do you? | |
| [MYERS]: | No, Your Honor. | |

(*Id.* at 213, 227).

In short, and as Agent Myers conceded, he was using Pacheco's continued detention and the detour to Pacheco's home to further a criminal investigation.  (Doc. 41, PageID 471-72). After waiting for a tow-truck to impound Marroquin's van, the officers departed the highway for Pacheco's house—with Pacheco and Marroquin in the back of Deputy Stickel's cruiser and Hugo in the back of Officer Salmon's vehicle.  (Doc. 40, PageID 165, 279, 281).  At that time, Marroquin was not under arrest (since he already faced removal proceedings), but Agent Myers offered him a ride back to his residence for purported safety reasons.  (*Id.* at 166).  Marroquin apparently agreed to the lift.  (*Id.*).

### E.  Pacheco's Continued Interrogation

After the officers completed the traffic stop, they took Pacheco, Marroquin, and Marroquin's brother back to Pacheco's residence, just a few miles away.  (*Id.* at 171, 301). Agent Myers estimated that the entire traffic stop, which began at 6:51 a.m., lasted "maybe 20 minutes approximately."  (*Id.* at 174).  At this point, Pacheco was either "detained" or "under arrest" for a suspected immigration violation, depending on which ICE officer you ask. (*Id.* at 203, 303).  *Marroquin*, however, had not been "detained" or "arrested"; indeed, Agent Myers informed him that he would be "free to leave" once they drove him home.  (*Id.* at 166; Doc. 41, PageID 394).  Nevertheless, once they arrived at Pacheco's residence, the officers did not let Marroquin *or* Pacheco out of the sheriff's cruiser.  (Doc. 41, PageID 396).  Instead, Agent Myers began questioning both men.  (*Id.* at 397).

According to Marroquin, Agent Myers first asked him if the officers could search his house, which was two doors away from Pacheco's home. (*Id.* at 396). Marroquin replied, "no"—because he had been brushing up on his legal rights, and he knew that "nobody can get in my house if they don't have an order." (*Id.* at 396-97). Marroquin testified that he told Agent Myers he was free to search his home only "[i]f you have an order." (*Id.* at 397). After Marroquin refused, Agent Myers allegedly turned his attention to Pacheco, who was sitting next to Marroquin in the back of the cruiser. (*Id.*). Pacheco equivocated when asked whether the officers could search his home:

> [BITTNER]:   Okay. How did Ivan answer?
>
> [MARROQUIN]:   Well, I guess Ivan, he don't—he don't say no[,] but he don't say yes. So he [was] trying to, I guess like, basically, you know, see[] why and stuff like that.

(*Id.* at 398).

According to Marroquin, Agent Myers refused to take "no" for an answer. (*Id.*). Instead, he circled back to both gentlemen on several occasions to obtain consent to search their homes. (*Id.* at 398-99). For example, when Agent Myers asked why he could not search Marroquin's home, Marroquin told him, "[w]ell, first of all, because I live with my sister[,] and my sister she [has] two little kids and I don't want to scare them . . . ." (*Id.* at 398). Agent Myers then asked whether Marroquin was "hid[ing] anything," like drugs or guns. (*Id.*). Marroquin told him, "no," he was not hiding anything—he just knew his rights and wanted to protect them. (*Id.*). Then, when the officers saw Marroquin's sister leaving for work, Agent Myers returned and asked whether he could search the home. (*Id.* at 398-99). Marroquin again refused. (*Id.* at 399). Marroquin testified that Agent Myers treated Pacheco similarly—asking him to search his house two or three times and demanding answers for why he could not. (*Id.* at 399-400).

10

Marroquin testified that Agent Myers asked these questions *before* reading either gentleman their *Miranda* rights.  (*Id.*).

| | |
|---|---|
| [BITTNER]: | I was going to ask you:  So before the officer was asking for permission to enter your home and to enter [Pacheco's] home, had the officer said to [Pacheco] you have the right to remain silent, you have the right to have an attorney present? |
| [MARROQUIN]: | No. |
| [BITTNER]: | You have a right to refuse to answer questions? |
| [MARROQUIN]: | No. |
| [BITTNER]: | No? |
| [MARROQUIN]: | No. |
| [BITTNER]: | He didn't ask [Pacheco] that before he entered his house? |
| [MARROQUIN]: | No. |

(*Id.* at 400).

According to Marroquin, Pacheco never explicitly consented to a home search.  (*Id.*). Eventually, Pacheco's girlfriend arrived, so Agent Myers began questioning whether *she* would consent to a search of their home.  (*Id.* at 401).  Marroquin could see Pacheco's girlfriend, Daisy Escamilla-Gonzales, speaking with Agent Myers in the driveway, near the sheriff's cruiser, but he could not hear everything they were saying.  (*Id.* at 401-02).  He believed that she denied consent to search the home.  (*Id.*).  Marroquin testified that Agent Myers then returned to the cruiser and continued to question Pacheco as to "why I can't get into your house," and whether Pacheco was "hid[ing] something" like "guns or drugs."  (*Id.* at 402).  Eventually, Pacheco gave in and told Agent Myers that he had a gun.  (*Id.* at 402, 408).  Marroquin estimated that, by now, it was roughly 8:00 a.m. (*id.* at 402), meaning nearly forty-five minutes had elapsed since they arrived at Pacheco's home.

Marroquin felt that Agent Myers led Pacheco to believe that if he confessed to having guns or drugs in the home, the ordeal would end. (*Id.* at 408-10 ("Well, he only say I have a gun, because the officer kept asking him what do you have, tell me what you have, just give it to me and basically I walk away, or something like that. And I guess [Pacheco] feels fine at that time, and he told them that he's got a gun. . . . to me, that was loose [talk] like, you know, give it to me and it's not going to be a problem.")).

Daisy Escamilla Gonzales's testimony aligns with Marroquin's version of events. She testified that she returned home around 7:45 a.m. that morning after taking her children to school. (*Id.* at 442). When she arrived, she saw two SUVs parked near her driveway, and Agent Myers quickly approached and told her that "he needed to search the house." (*Id.*). According to Daisy, Agent Myers first indicated that he already obtained consent to search the home from Pacheco, so she just nodded and went inside. (*Id.* at 442-43). Once inside, however, she shut the door, called someone for assistance, and learned that the officers could not search her home without a warrant. (*Id.* at 443). So she went back outside and told Agent Myers that he could not search their home. (*Id.*). After she went back inside, Agent Myers returned to her door and told her the officers had to enter because they "already knew that the guys were illegal immigrants and they needed to make sure there were no drugs inside the house." (*Id.*). Daisy again informed Agent Myers that they could not enter her home: "[I] told them that just because [the guys] were not here legally didn't mean that they were drug dealers." (*Id.*). Agent Myers then told Daisy that he already knew there was a gun in the house because Pacheco told him about it, and that he would go get a search warrant, come back, and arrest *her* too because there was a gun in the home. (*Id.*). At that point, Daisy relented and allowed the officers inside. (*Id.* at 443-44).

Pacheco submitted an affidavit in support of his motion to suppress that mostly mirrored Marroquin's version of events inside the sheriff's cruiser:[7]

> [W]hen we got to my house, all of the officers were there, including Mr. Myers and the immigration officer. They had not told me I was under arrest. They had not told me I had the right to refuse to answer their questions, or that I had the right to have a lawyer present. . . . [T]hey did not let me and Gerardo out of the back of the sheriff's patrol car. Mr. Myers . . . . wanted to search my house. He said that they had to make sure that I did not have any drugs in the house before they let me go. Several times, I refused to let him enter my house. However, Mr. Myers was very insistent, and while keeping me inside the patrol car, he repeatedly asked me if he could search my house. Mr. Myers said that for him to let me go, he had to search my house to make sure that I did not have any drugs . . . . Mr. Myers said that since we were immigrants, he had to make sure we weren't selling drugs. Approximately three times Mr. Myers told me that they couldn't let me go until they searched my house. I had been in the back of the patrol car for a long time, over an hour, and I thought that since he was the police, I was required to let him search my house before he'd let me go. I finally said they could search my house because I thought I had to allow them to search in order to be released. Then Mr. Myers asked me if there were any sharp objects like knives, that they could poke themselves, or any guns in my house. After I answered, the officers went into my house . . . .

(Doc. 32, PageID 105).

The ICE officers testified to a very different version of events. According to Agent Myers, he read Pacheco his *Miranda* rights upon first returning to Pacheco's residence. (Doc. 40, PageID 171, 173, 176). Officer Salmon testified to the same effect. (*Id.* at 301-02). Agent Myers also insisted that he obtained a rights-waiver from Pacheco before asking him for consent to search the home and before Pacheco admitted to having a gun inside. (*Id.* at 177 ("Yes. The *Miranda* form was signed . . . before I even asked him for consent or talked to him about consent for his house.")). Officer Salmon agreed with this timeline. (*Id.* at 303, 307-08). The Government introduced Pacheco's signed *Miranda*-waiver form as "Government's Exhibit 1" during the suppression hearing. (*Id.* at 177-79, 307-08).

---

[7] The Court exercises its discretion in considering Pacheco's affidavit, but assigns it less weight than live testimony given that he did not testify at the suppression hearing, thereby denying the Government the ability to cross-examine him. *See United States v. Ramos*, 591 F. Supp. 2d 93, 113 (D. Mass. 2008).

### F. The Warrantless Search of Pacheco's Residence

According to Agent Myers, he waited until after Pacheco signed the *Miranda*-waiver form to begin questioning him about searching the home. (*Id.* at 177). Agent Myers told Pacheco, "I want[] to search for the possibility of cocaine in there because I ha[ve] information that [you] may be trafficking." (*Id.* at 179). Agent Myers then asked for consent to search the home and specifically "asked [Pacheco] if he had anything in his house that would be a danger for law enforcement," like guns or knives. (*Id.*). Agent Myers testified that Pacheco responded "he had a loaded gun in his living room in a glass case on a shelf." (*Id.* at 179-80). This admission apparently occurred before Pacheco signed a consent-to-search form. (*Id.* at 180). Officer Salmon's testimony bears out Agent Myers's testimony on these points. (*Id.* at 307-09). The Government introduced Pacheco's consent-to-search form as "Government's Exhibit 2A." (*Id.* at 180-81, 184). Agent Myers likewise testified that he obtained a signed consent-to-search form from Pacheco's girlfriend, Daisy, before entering the home. (*Id.* at 182-83). The Government introduced Daisy's consent-to-search form as "Government's Exhibit 2B." (*Id.*).

Marroquin and Pacheco both contest this timeline. Marroquin testified that he was with Pacheco the whole time but did not see him sign any consent forms until *after* the officers searched his home. (*Id.* at 404-05, 408).[8] And Pacheco averred that, after admitting he had a gun in the home, the officers went in, "and after they had already searched my house, Mr. Myers had me sign some papers, and then he told me I was under arrest." (Doc. 32, PageID 105). But Pacheco insists "no one had told me that I had the right to refuse to answer questions or that I had the right to have an attorney present." (*Id.* ("They just kept me in the patrol car and Mr. Myers said repeatedly that he'd let me go after I let them search my house.")).

---

[8] At one point, Marroquin intimated that Pacheco signed a consent form before the officers searched his home. (*Id.* at 405-06). But later, he clarified that he only saw Pacheco sign the consent form(s) after the search was complete. (*Id.* at 408, 433-34, 436-37).

Consensual or not, the search uncovered four firearms and a variety of shells and cartridges, all of which the officers immediately seized.  Those firearms included a shotgun (a Rock Island Armory M5 shotgun) recovered from the downstairs living room; a rifle (a Ruger 10/22) recovered next to Pacheco's bed; and two Hi-Point pistols enclosed in a weapons case in his bedroom.  (Doc. 40, PageID 187-88, 190-93).  The officers also recovered a cattle prod and a BB-gun pistol.  (*Id.* at 188).  The Bureau of Alcohol, Tobacco, Firearms and Explosives initiated an investigation and determined that the shotgun, the rifle, and one of the Hi-Point pistols traveled in interstate commerce.  (*Id.* at 197).  The other Hi-Point pistol, which was manufactured in Ohio, never left the state.  (*Id.* at 199).  The officers did not find any drugs. (*Id.* at 247).  All told, the search lasted roughly fifteen minutes.  (Doc. 41, PageID 404).

Agent Myers took Pacheco back to his office shortly after discovering the firearms— sometime between 8:30 a.m. and 9:00 a.m.  (Doc. 40, PageID 224).  Agent Myers then presented Pacheco's case to the U.S. Attorney's Office for prosecution on Monday, April 25, 2016, and to ICE's Office of Chief Counsel for removal proceedings (deportation proceedings) the same day. (*Id.* at 235-40).

### G.  Procedural History

The Government filed a Complaint against Pacheco on April 25, 2016, alleging a violation of 18 U.S.C. § 922(g)(5)(B), which forbids illegal immigrants from possessing or receiving firearms or ammunition shipped in interstate commerce.  (Doc. 1).  Pacheco filed a motion to suppress on September 2, 2016, alleging violations of his Fourth and Fifth Amendment rights.  (Doc. 28).  The Government filed a response in opposition soon after (Doc. 28), and the Court held a suppression hearing on October 25-26, 2016, (*see* Minute Entry, Oct. 26, 2016). The matter now is ripe for review.

## II.  LEGAL STANDARDS

The Fourth Amendment protects against unreasonable searches and seizures.  To comply with it, law-enforcement personnel generally must obtain a warrant, supported by probable cause, from a neutral and detached judicial officer before searching people or their houses, papers, and effects for evidence of criminal wrongdoing.  *Riley v. California*, 134 S. Ct. 2473, 2482 (2014); *Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011).  These requirements "guarantee[] the privacy, dignity, and security of persons against certain arbitrary and invasive acts by officers of the Government or those acting at their discretion."  *See Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 613-14 (1989) (quotation omitted).  Searches and seizures conducted without a warrant are presumptively unreasonable.  *King*, 131 S. Ct. at 1856.  Nevertheless, because "the ultimate touchstone of the Fourth Amendment is 'reasonableness,'" the warrant requirement is subject to several exceptions.  *Id.* (quotation omitted).

Defendants who seek to suppress evidence allegedly obtained in violation of the Fourth Amendment bear the burden of proof.  *See, e.g.*, *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003) ("It is well settled that in seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression." (quotation omitted)); *United States v. Blakeney*, 942 F.2d 1001, 1015 (6th Cir. 1991) ("In the context of a motion to suppress, the moving party has the burden of establishing that the evidence was secured by an unlawful search.").  The Sixth Circuit has made clear that this burden of proof extends to both "the burden of production and persuasion." *United States v. Patel*, 579 F. App'x 449, 453 (6th Cir. 2014) ("The defendant who requests suppression bears the burden of production and persuasion.").

The Fifth Amendment also provides bedrock protections against government overreach. It states that no individual "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. As interpreted by *Miranda v. Arizona*, 384 U.S. 436 (1966), the Fifth Amendment requires that an individual subject to custodial interrogation be informed clearly and unequivocally: (1) that he "has the right to remain silent"; (2) that "anything said can and will be used against the individual in court"; and (3) that "he has the right to consult with a lawyer and to have the lawyer with him during interrogation;" and (4) "that if he is indigent[,] a lawyer will be appointed to represent him," *id.* at 467-73. These warnings form "an absolute prerequisite to interrogation." *Id.* at 471. Although an individual may waive some or all of these rights, the government must show that such a waiver was done "knowingly and intelligently." *Id.* at 475.

When a defendant seeks suppression on *Miranda* grounds, he bears the burden of proving that he was subjected to a custodial interrogation, and thus entitled to *Miranda* warnings in the first place. *See United States v. Lawrence*, 892 F.2d 80, 1989 WL 153161, at *5 (6th Cir. 1989) (unpublished table decision) ("In a suppression hearing, the burden of persuasion rests with the party seeking to suppress the evidence."); *United States v. Donaldson*, 493 F. Supp. 2d 998, 1003 (S.D. Ohio 2006) (same). If a defendant succeeds in showing that he was subjected to a custodial interrogation, and therefore that *Miranda* warnings were constitutionally required, the government then must show that any statements obtained occurred *after* a knowing and voluntary waiver of the defendant's *Miranda* rights. *See United States v. Mills*, 869 F.2d 1494, 1989 WL 19669, at *1 (6th Cir. 1989) (unpublished table decision) (citing *Colorado v. Connelly*, 479 U.S. 157, 168-69 (1986)). The government must show a knowing and voluntary *Miranda* waiver by a preponderance of the evidence. *Connelly*, 479 U.S. at 168.

17

## III. ANALYSIS

Pacheco moves to suppress all evidence obtained as the result of any unlawful search, seizure, detention, interrogation, or arrest that occurred on April 22, 2016. (Doc. 28). Pacheco raises the following arguments under the Fourth and Fifth Amendments: (1) the government unlawfully seized him after the initial traffic stop, in violation of the Fourth Amendment; (2) the government interrogated him without giving an adequate *Miranda* warning, in violation of the Fifth Amendment; (3) the government coerced him into consenting to a search of his home, in violation of the Fourth Amendment; and (4) the government coerced him into confessing that he possessed a firearm unlawfully, in violation of the Fifth Amendment. (*Id.*). The Court will address each of Pacheco's arguments in the order in which the events occurred.

### A. The Initial Traffic Stop and Pacheco's Roadside Detention Were Lawful.

#### 1. The Initial Traffic Stop Was Lawful.

The initial traffic stop for operating a motor vehicle with the wrong license plate was lawful—even if, as Pacheco argues, it was nothing more than a sham designed to uncover further criminal activity. Make no mistake: the Court is deeply troubled by Agent Myers's unilateral decision to bypass the federal judiciary in his effort to nab Pacheco. Nevertheless, as set forth below, the initial traffic stop was lawful.

Traffic stops constitute a "seizure" within the meaning of the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). As such, evidence seized as a result of an illegal traffic stop must be suppressed "as [tainted] fruits of the poisonous tree." *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008) (quotation omitted). Police officers, however, may lawfully stop a vehicle whenever they have probable cause to believe that a traffic violation has occurred. *United States v. Jackson*, 682 F.3d 448, 453 (6th Cir. 2012).

Based on the uncontroverted testimony of Deputies Stickel and McKee, the Court concludes that the traffic stop was lawful due to their observation that Marroquin was driving a van while displaying another vehicle's license plates. *See* Ohio Rev. Code § 4549.08(A)(3) ("No person shall operate or drive a motor vehicle upon the public roads and highways in this state if it displays a license plate number or identification mark that . . . [b]elongs to another motor vehicle."). Because the deputies observed this traffic violation, the initial traffic stop was lawful, regardless of the officers' true purpose for stopping the van. *Whren v. United States*, 517 U.S. 806, 813 (1996); *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993) (en banc).

### 2. Pacheco's Roadside Detention Was Lawful.

Pacheco fares no better in contesting his roadside detention during the initial traffic stop. The Fourth Amendment permits such a detention so long as it does not prolong the purpose of the traffic stop. *Rodriguez v. United States*, 135 S. Ct. 1609, 1614-15 (2015).

The officers first "seized" Pacheco upon initiation of the traffic stop. The question, then, is whether his seizure remained lawful throughout the stop. The "tolerable duration" of police inquiries during a traffic stop "is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop." *Id.* at 1614. Because the violation justifies the stop, the stop "may last no longer than is necessary to effectuate th[at] purpose." *Id.* (quotation omitted). Nevertheless, an officer's inquiries "into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009). In other words, an officer "may conduct certain unrelated checks," but not "in a way that prolongs the stop," unless the officer obtains "reasonable suspicion ordinarily demanded to justify detaining an individual." *Rodriguez*, 135 S. Ct. at 1614-15.

19

Here, there is no evidence that the ICE officers prolonged the traffic stop while they investigated Pacheco's immigration status. According to Agent Myers, their investigation began within the first ten minutes of the traffic stop. (Doc. 40, PageID 174-75). Officer Salmon first conducted the mobile "IDENT" fingerprint examination—which revealed that Pacheco was denied an immigration application in 2004 and that "there was no further paperwork in the system showing that [Pacheco] had any kind of legal status in the United States." (*Id.* at 171-74). Agent Myers and Officer Salmon then began questioning Pacheco about his status. (*Id.*). At that point, Pacheco admitted that he was born in Mexico and that he lacked any paperwork allowing him to reside in the United States lawfully. (*Id.* at 171). Based on the informant's tip that Pacheco was present unlawfully, the results of the mobile fingerprint examination, and Pacheco's own admissions, Agent Myers informed him that "he was being detained" for immigration purposes. (*Id.* at 172-73; *see also id.* at 290-91, 295-96). All told, roughly twenty minutes had passed. (*Id.* at 174).

This chain of events shows that Pacheco's roadside detention was lawful under the Fourth Amendment. As explained, the ICE officers' immigration-related investigation did not prolong the otherwise lawful traffic stop. Agent Myers testified that the fingerprint examination and questioning occurred within the first twenty minutes of the stop. (Doc. 40, PageID 174-75). And Deputy Stickel's testimony suggests that the traffic stop was still ongoing at that time because he had to take the driver, Gerrardo Marroquin, back to his cruiser to obtain a positive identification, write up the traffic ticket, and wait for a tow-truck to come impound the van. (*Id.* at 277-78). Thus, Pacheco's roadside detention during the otherwise lawful traffic stop did not violate the Fourth Amendment. *See Rodriguez*, 135 S. Ct. at 1614-15 (citing *Johnson*, 555 U.S. at 327-28).

**B. The Officers Were Required to Provide *Miranda* Warnings Before Questioning Pacheco About his Citizenship and Immigration Status.**

Although the officers were allowed to stop the van and detain Pacheco during the otherwise lawful traffic stop, the Fifth Amendment required them to provide *Miranda* warnings before questioning him about his citizenship and immigration status. *United States v. Jimenez-Robles*, 98 F. Supp. 3d 906, 911-19 (E.D. Mich. 2015). Because the officers failed to provide those warnings, any statements that Pacheco made regarding his citizenship and immigration status must be suppressed. *Id.* at 919.

As indicated, "[t]he requirements of *Miranda* arise only when a defendant is *both* in custody and being interrogated." *United States v. Head*, 407 F.3d 925, 928 (8th Cir. 2005); *United States v. Swanson*, 341 F.3d 524, 528 (6th Cir. 2003). So long as these criteria are met, officers must provide *Miranda* warnings, regardless of the defendant's immigration status. *United States v. Mata-Abundiz*, 717 F.2d 1277, 1280 (9th Cir. 1983) ("We hold that in-custody questioning by INS investigators must be preceded by *Miranda* warnings, if the questioning is reasonably likely to elicit an incriminating response."); *Jimenez-Robles*, 98 F. Supp. 3d at 911 ("The Fifth Amendment protection afforded by the *Miranda* rule applies to citizens and aliens alike."). Pacheco's roadside questioning satisfies both criteria.

### 1. Pacheco Was "In Custody" for *Miranda* Purposes.

To be sure, the questioning that occurs during a routine traffic stop generally requires no *Miranda* warnings because these everyday police-motorist encounters are brief, non-threatening, and conducted in the presence of others. *Berkemer v. McCarty*, 468 U.S. 420, 437-38 (1984); *Jimenez-Robles*, 98 F. Supp. 3d at 914 ("The court acknowledges that in *Berkemer v. McCarty*, the Supreme Court held that motorists subjected to garden-variety traffic stops are not entitled to *Miranda* warnings.").

21

But not all traffic stops are "routine."  The Supreme Court thus recognizes "that when a given traffic stop becomes more coercive than a routine traffic stop, police may well be required to advise a suspect of his *Miranda* rights even though the underlying seizure of the individual might qualify as a reasonable investigative detention under the Fourth Amendment."  *See id.* (citing *Berkemer*, 468 U.S. at 440).  As the *Berkemer* Court explained, "if a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda*."  468 U.S. at 440.

The test for determining whether a roadside traffic stop amounts to a custodial interrogation subject to *Miranda* is whether the "traffic stop exerts upon a detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights."  *Id.* at 437.  The relevant inquiry, therefore, "is how a reasonable man in the suspect's position would have understood his situation."  *Id.* at 442.  Courts must consider several factors in determining whether a person is "in custody" for *Miranda* purposes during a roadside stop, "notwithstanding the traffic-stop nature of the origination of [their] detention."  *Jimenez-Robles*, 98 F. Supp. 3d at 916.  These factors include:

> (1) whether a reasonable person in the defendant's position would have felt free to leave; (2) the purpose of the law enforcement questioning; (3) whether the place of the questioning was hostile or coercive; (4) the length of the questioning; and (5) other indicia of custody such as (a) whether the defendant was informed at the time that the questioning was voluntary or that the suspect was free to leave; (b) whether the defendant possessed unrestrained freedom of movement during questioning; (c) and whether the defendant initiated contact with the police or acquiesced to their requests to answer questions.

*Id.* (citing *Swanson*, 341 F.3d at 529); *see United States v. Ortega*, 379 F. Supp. 2d 1171, 1186 (D. Kan. 2005) (outlining similar factors).

22

Here, the record shows that Pacheco's immigration-related questioning "did not take place during an 'ordinary' traffic stop, as described by the *Berkemer* Court." *Jimenez-Robles*, 98 F. Supp. 3d at 915. Instead, that questioning occurred during a roadside stop so coercive as to require *Miranda* warnings before any interrogation.[9]

For starters, a reasonable person in Pacheco's position would not have felt free to leave. *Id.* at 916-17. Agent Myers made it clear throughout his testimony that his end game was busting Pacheco for guns and drugs, and he never told Pacheco that he was or would be free to leave. *Id.*; *see also United States v. Williams*, 690 F. Supp. 2d 829, 846 (D. Minn. 2010) (holding that *Miranda* warnings were required due to irregularities in traffic stop, officer's insistence on pulling the vehicle over, and lack of warnings that motorists were free to leave). Before questioning him, Agent Myers removed Pacheco from the van and denied him access to it while the sheriff's deputies conducted a canine sweep (which netted an alert) and then a full vehicle search. *Jimenez-Robles*, 98 F. Supp. 3d at 917; *Ortega*, 379 F. Supp. 2d at 1186 ("A reasonable person would not have felt free to leave after being told that a drug dog alerted to the scent of drugs in his vehicle."). Furthermore, Agent Myers testified that four task-force officers were on the scene at all times. Far from being a routine, "one-officer and one motorist encounter," this traffic stop involved a task force comprised of four law-enforcement vehicles, four officers (from two agencies), and a drug dog. *Jimenez-Robles*, 98 F. Supp. 3d at 916. Although no weapons were drawn or displayed, in *United States v. Mitchell*, 161 F. App'x 537 (6th Cir. 2006), the presence of four officers persuaded the court that the defendants were "in custody" for *Miranda* purposes because under those circumstances, "a reasonable person in [defendants'] position would not have felt at liberty to terminate the interrogation and leave." *Id.* at 540. So too here.

---

[9] Deputy Stickel put it best: "This was not an average traffic stop." (Doc. 40, PageID 281).

The second factor—the purpose of the questioning—also shows that Pacheco was in custody. *See Jimenez-Robles*, 98 F. Supp. 3d at 917. Pacheco was not questioned by the officer who stopped the van for the traffic offense; "Instead, he was questioned by an immigration officer about his citizenship and immigration status." *Id.* This questioning "was entirely unrelated" to the offense "which gave rise to the traffic stop." *Id.* Moreover, Agent Myers testified that "he knew well-before [sic] commencing this questioning that [Pacheco] was likely in the country illegally, and his questioning was clearly conducted for the purpose of eliciting an incriminating response." *See id.* Several courts have held that "asking a detainee questions unrelated to the stop is evidence of a custodial interrogation." *Id.* (collecting cases).

As for the third factor—the place of questioning—a public roadside is "plainly in and of itself . . . not overtly coercive." *Id.* But the time of day (just at sunrise), the manner of the stop (a four-car task force), and the number of the officers on-scene all helped "transform[] that benign public place into a restrictive area of confinement, which also tips the scales in favor of [Pacheco]." *See id.* Consider also that, at one time or another, the officers segregated each man for questioning and confined each man to the back of a sheriff's cruiser. This too tips the scales in Pacheco's favor. *See Mitchell*, 161 F. App'x at 540.

As for the length of questioning, Pacheco's stop lasted "longer than a 'few minutes.'" *Jimenez-Robles*, 98 F. Supp. 3d at 915 (quotation omitted). Instead, it lasted roughly twenty minutes, which suggests that he was "in custody." *See Berkemer*, 468 U.S. at 441 & n.34 (contrasting routine traffic stop with one in which driver "was detained over one-half hour"). Moreover, Pacheco's traffic stop resulted in his arrest. In *Swanson*, the Sixth Circuit considered both the duration and whether the defendant was arrested at the conclusion of the interview in its analysis regarding custody under the "length of questioning" factor. 341 F.3d at 530.

24

And as for the other indicia of custody, they too suggest that Pacheco was entitled to *Miranda* warnings. Agent Myers never informed Pacheco that the officers' questioning was voluntary or that he was free to leave. *Jimenez-Robles*, 98 F. Supp. 3d at 918 (collecting cases); *see also Ortega*, 379 F. Supp. 2d at 1186 ("First, the court must consider . . . whether a suspect is informed that he or she may refuse to answer questions or terminate the encounter."). This lack of warning that Pacheco was "at liberty to decline to answer questions or free to leave" forms "a significant indication of a custodial detention." *Jimenez-Robles*, 98 F. Supp. 3d at 918 (quotation omitted). Further, there was no indication that Pacheco possessed unrestrained freedom of movement during the officers' questioning. At all times, he was either detained on the side of the road or in the backseat of a sheriff's cruiser. Finally, Pacheco did not initiate contact with the ICE officers. Far from it—he merely was traveling to work one morning when Agent Myers's task force sprang upon him.

Considering the totality of the circumstances, the Court finds that Pacheco was "in custody" when Agent Myers and Officer Salmon took his fingerprints and questioned him about his citizenship and immigration status. *See Jimenez-Robles*, 98 F. Supp. 3d at 919. A reasonable person in Pacheco's position would not have felt free to leave. *See, e.g.*, *Mitchell*, 161 F. App'x at 540; *Jimenez-Robles*, 98 F. Supp. 3d at 919; *Williams*, 690 F. Supp. 2d at 846; *Ortega*, 379 F. Supp. 2d at 1186.

### 2. The Officers "Interrogated" Pacheco for *Miranda* Purposes.

The ICE officers likewise "interrogated" Pacheco for *Miranda* purposes when they questioned him about his immigration status. *Jimenez-Robles*, 98 F. Supp. 3d at 912-13; *see also Mata-Abundiz*, 717 F.2d at 1279-80; *United States v. Bonilla-Siciliano*, No. 06-00305-01, 2008 WL 1820828, at *5 (W.D. Mo. Apr. 18, 2008).

In determining whether law-enforcement questioning constitutes "interrogation" for *Miranda* purposes, courts ask whether the officer questioning the suspect knew or reasonably should have known that the questions were "reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980); *McKinney v. Hoffner*, 830 F.3d 363, 371 (6th Cir. 2013). Questioning a suspect about biographical information generally does not trigger the *Miranda* Rule under the "routine booking" exception. *E.g.*, *United States v. Ozuna*, 170 F.3d 654, 657 n.1 (6th Cir. 1999) ("[N]ot all questioning of in-custody suspects constitutes interrogation triggering *Miranda* protections. In the context of routine booking following an arrest, this Court has held that 'routine biographical questions are not ordinarily considered interrogation.'" (quoting *United States v. Clark*, 982 F.2d 965, 968 (6th Cir. 1993))); *Mata-Abundiz*, 717 F.2d at 1280 (discussing "routine booking procedures" exception to *Miranda*).

Here, and in "similar cases," the Government has argued that questioning aliens about their immigration status "is akin to 'routine booking information,'" and thus, requires no *Miranda* warnings. *See Bonilla-Siciliano*, 2008 WL 1820828, at *5 (collecting cases). Courts just as routinely reject this argument, however. *Id.* As one court explained, the *Miranda* calculus changes when a suspect's "foreign citizenship and immigration status are core elements of the crime with which he is charged." *Jimenez-Robles*, 98 F. Supp. 3d at 912. Under these circumstances, where the officer who questioned the suspect "was reasonably aware of who he was interviewing [and] his citizenship, . . . obtaining basic pedigree information . . . was not just obtaining necessary background information." *Id.* (quotation omitted). Instead, obtaining that information "was likely to provide the primary evidence supporting a violation of the immigration laws, since in an immigration case, questions pertaining to place of birth go beyond basic pedigree information and go to the heart of the crime itself." *Id.* (quotation omitted).

Courts thus routinely require *Miranda* warnings before law-enforcement officers may ask basic background questions of a suspected alien, at least where those questions are reasonably likely to elicit incriminating information about a particular offense. For example, in *Mata-Abundiz*, the defendant was arrested and charged with violations of state law. 717 F.2d at 1278. While in jail on those charges, an INS investigator visited the defendant to obtain biographical information about his immigration status. *Id.* The investigator did not advise the defendant of his *Miranda* rights. *Id.* During the interview, the investigator learned that the defendant was a citizen of Mexico. *Id.* The investigator then promptly obtained a warrant for the defendant's arrest. *Id.* Following the defendant's conviction for possession of a firearm by an illegal alien, the Ninth Circuit reversed, holding that in-custody questioning by INS investigators must be preceded by *Miranda* warnings. *Id.* at 1278-80. In that case, "the questioning from Investigator DeWitt was reasonably likely to elicit an incriminating response from [the defendant]," because "the 'background questions' asked related directly to an element of a crime that DeWitt had reason to suspect." *Id.* at 1280. Hence, *Miranda* warnings were required. *Id.*

In *United States v. Parra*, 2 F.3d 1058 (10th Cir. 1993), the Tenth Circuit held that *Miranda* warnings were required prior to questioning by an INS agent where the suspect was in custody, the questioning went to the suspect's true identity, and the questioning was "reasonably likely to elicit incriminating information relevant to establishing an essential element necessary for a conviction of being an illegal alien in possession of a firearm," *id.* at 1067-68. The court agreed that "where questions regarding normally routine biographical information are designed to elicit incriminating information, the questioning constitutes interrogation subject to the strictures of *Miranda*." *Id.* at 1068. Thus, questions designed to link the alien suspect to his true identity should have been preceded by *Miranda* warnings. *Id.*

Likewise, in *Jimenez-Robles*, the court suppressed a defendant's answers to immigration-related questioning during a traffic stop and roadside detention because the officer "should have known that the questions he put to [the defendant]—whether he was a U.S. citizen and whether he was in the country legally—were reasonably likely to elicit an incriminating response." 98 F. Supp. 3d at 913.  The court keyed on the fact that the border patrol agent knew of the defendant's prior deportation before questioning him about his immigration status. *Id.* Indeed, in that case, the government ultimately abandoned its argument that the defendant was not subject to "interrogation" because his questioning "was done [only] for 'administrative' immigration purposes." *Id.* Instead, the government agreed that the border patrol agent's questions "did amount to 'interrogation' for *Miranda* purposes." *Id.*

Other courts have followed suit in a string of cases involving background and pedigree questioning of suspected aliens. *See, e.g.*, *United States v. Arroyo-Garcia*, No. 1:12-CR-0357, 2014 WL 1309078, at *8 (N.D. Ga. Mar. 31, 2014) (holding that *Miranda* warnings were required where "questions about whether [defendant] was in the country illegally and whether he had any documentation . . . went beyond merely determining alienage, and predictably elicited incriminating responses based on the facts known to agents at the outset of the interview"); *United States v. Sepulveda-Sandoval*, 729 F. Supp. 2d 1078, 1099, 1101 (D.S.D. 2010) (holding that questions as to whether defendant was in the country legally were not routine booking questions but, rather, constituted interrogation requiring *Miranda* warnings where defendant faced the charge of being an unlawful alien in possession of a firearm); *United States v. Toribio-Toribio*, No. 09-cr-161, 2009 WL 2426015, at *2 (N.D.N.Y. Aug. 6, 2009) (holding that background and pedigree questioning of suspected alien was unconstitutional in the absence of *Miranda* warnings); *Bonilla-Siciliano*, 2008 WL 1820828, at *5-6 (same).

Under this line of cases, Agent Myers was required to provide *Miranda* warnings before questioning Pacheco about his citizenship and immigration status.  Consider what Agent Myers suspected before arriving on-scene: (1) Pacheco was in the country illegally; (2) Pacheco carried firearms and cocaine on his person on more than one occasion; and (3) Pacheco sold firearms and cocaine to people all over town.  (Doc. 40, PageID 161, 165; Doc. 41, PageID 459).  Surely Agent Myers knew, or should have known, that Pacheco's responses to his questioning would "likely . . . elicit an incriminating response."  *See Innis*, 446 U.S. at 301.  After all, being an unlawful alien is a necessary element of 18 U.S.C. § 922(g)(5)(B), the singular felony offense of which Pacheco stands accused.

The Government tries to avoid this outcome by relying on various provisions of federal immigration law and by couching any pre-*Miranda* questioning as part of a "civil" or "administrative" investigation, as opposed to a criminal matter.  Both arguments lack merit.

The Court recognizes that immigration law contemplates some questioning of suspected aliens and, indeed, a brief detention for investigative purposes under appropriate circumstances. *See* 8 U.S.C. § 1357(a)(1) ("Any [authorized] officer or employee of [ICE] . . . shall have power without warrant . . . to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States."); 8 C.F.R. § 287.8(b)(2) ("If the immigration officer has a reasonable suspicion, based on specific articulable facts, that the person being questioned is . . . an alien illegally in the United States, the immigration officer may briefly detain the person for questioning.").  But these provisions "do[] not . . . answer the issue of whether [Pacheco's] *constitutional* rights were violated by the questions propounded—without the benefit of *Miranda* warnings—regarding his immigration status."  *See Bonilla-Siciliano*, 2008 WL 1820828, at *4 (emphasis added) (addressing *Miranda* challenge separately).

Similarly, immigration officers cannot avoid *Miranda*'s requirements "simply by labeling immigration inquiries as 'civil' or 'administrative.'" *Jimenez-Robles*, 98 F. Supp. 3d at 912. As the Ninth Circuit has explained, "the investigator cannot control the constitutional question by placing a 'civil' label on the investigation." *Mata-Abundiz*, 717 F.2d at 1279-80 (citing *Mathis v. United States*, 391 U.S. 1 (1968)). This Court agrees that "the Government cannot avoid the requirements of *Miranda* simply by labeling immigration investigations 'civil' or 'administrative' when its agents know or reasonably should have known that the questions they ask . . . are likely to elicit incriminating responses." *United States v. Mellado-Evanguelista*, No. 08-307(1), 2009 WL 161240, at *4 (D. Minn. Jan. 22, 2009). The constitutional safeguards of *Miranda* remain in full force, regardless of the labels that immigration officers place on their investigations.

In this case, Agent Myers knew enough about Pacheco before the traffic stop to foresee that his questioning might elicit incriminating responses. Indeed, Agent Myers testified that he ordered the traffic stop for precisely those reasons. (*See* Doc. 40, PageID 168-70 (agreeing that he "had [Pacheco] stopped" for four reasons, including: (1) "he might have a gun"; (2) "he might be illegally in the country"; and (3) "he might be dealing cocaine")). As an ICE agent responsible for conducting Homeland Security Investigations, Agent Myers "is or should be familiar with the immigration laws of the United States, including those that carry criminal penalties," such as being an unlawful alien in possession of a firearm. *Mellado-Evanguelista*, 2009 WL 161240, at *6; *see also* 18 U.S.C. § 922(g)(5)(B). Under these circumstances, the Court concludes that Agent Myers, at a minimum, should have known that the questions he asked during the April 22nd roadside interview were likely to elicit incriminating responses. *Miranda* warnings, therefore, were required.

30

Because Agent Myers placed Pacheco "in custody" and "interrogated" him without first providing *Miranda* warnings, as constitutionally required, Pacheco's statements regarding his citizenship and immigration status must be suppressed. *Jimenez-Robles*, 90 F. Supp. 3d at 919.[10]

### C. The Officers Lacked Legal Justification to Continue to Detain Pacheco.

As explained, Pacheco's roadside detention *during* the otherwise lawful traffic stop did not violate the Fourth Amendment. The question, then, is whether the officers were justified in *continuing* to detain Pacheco when they hauled him back to his residence in the hopes of obtaining consent to search his home. *See United States v. Quintana*, 623 F.3d 1237, 1241 (8th Cir. 2010) ("Here, the critical issue is whether Agent Bane acquired probable cause during the valid traffic stop to take Diaz-Quintana into administrative custody as a deportable alien."). This issue "turns on issues of immigration law enforcement." *Id.* at 1238.

Federal immigration law permits ICE officers to make both brief, investigatory detentions *and* warrantless arrests for suspected immigration violations under appropriate circumstances. *Id.* at 1239-40 (citing 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(b)-(c)). Specifically, an ICE officer may "briefly detain a person for questioning" if the officer "has a reasonable suspicion, based on specific, articulable facts, that the person . . . is an alien illegally in the United States." 8 C.F.R. § 287.8(b)(2). And an ICE officer may arrest a person if the officer has "reason to believe" that the person is an alien illegally in the United States *and* "is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(2); 8 C.F.R. § 287.8(c)(2)(i)-(ii).

---

[10] Pacheco does not argue that his fingerprints must be suppressed due to the officers' failure to provide *Miranda* warnings. Nor could he. As several courts have concluded, "the *Miranda* rule protects against violations of the Self-Incrimination Clause, which, in turn, is not implicated by the introduction at trial of physical evidence resulting from voluntary statements." *United States v. Lara-Garcia*, 478 F.3d 1231, 1235-36 (10th Cir. 2007) (quotation omitted) (holding that *Miranda* violation did not require suppression of immigrant's fingerprints); *United States v. Flores-Sandoval*, 474 F.3d 1142, 1147 (8th Cir. 2007) (holding that, even if defendant were "in custody," a *Miranda* violation would not require suppression of his fingerprints because "[t]he Fifth Amendment's Self Incrimination Clause offers no protection against compulsion to submit to fingerprinting." (quotation omitted)).

Because the Fourth Amendment applies to arrests of citizens and illegal aliens alike, courts have construed the term "reason to believe" in § 1357(a)(2) and its accompanying regulations to mean "constitutionally required probable cause." *Quintana*, 623 F.3d at 1239 (collecting cases); *see also, e.g.*, *Morales v. Chadbourne*, 793 F.3d 208, 216 (1st Cir. 2015) ("Courts have consistently held that the 'reason to believe' phrase in § 1357 must be read in light of constitutional standards, so that 'reason to believe' must be considered the equivalent of probable cause." (quotation omitted)).  As such, "immigration stops and arrests [are] subject to the same Fourth Amendment requirements that apply to other stops and arrests—reasonable suspicion for a brief stop, and probable cause for any further arrest and detention." *Morales*, 793 F.3d at 215; *see also Vargas Ramirez v. United States*, 93 F. Supp. 3d 1207, 1218-19 (W.D. Wash. 2015) ("[T]he lawfulness of a Border Patrol agent's seizure turns on the familiar principles of reasonable suspicion and probable cause . . . .").

### 1.  The Officers *Arrested* Pacheco when they Detained him in the Back of a Sheriff's Cruiser for over an Hour and Hauled him Back to his House.

To determine whether Pacheco's continued detention was lawful, the Court first must decide whether it remained a brief, investigatory detention or ripened into a full-fledged arrest. In determining whether an investigatory stop becomes an arrest, courts look at the totality of the circumstances and must consider several factors.  These factors include the length of the detention, any transportation of the detainee to another location, the manner in which the detention was conducted, significant restraints on the detainee's freedom of movement involving physical confinement or other coercion, whether the officers read the suspect his *Miranda* rights, and any use of weapons or bodily force.  *Brown v. Lewis*, 779 F.3d 401, 414 (6th Cir. 2015); *United States v. Lopez-Medina*, 461 F.3d 724, 740 (6th Cir. 2006).

Although no one factor is dispositive, courts often focus on the "investigative means" the officers employed, *United States v. Perez*, 440 F.3d 363, 372 (6th Cir. 2006), as well as whether they "transport[ed] [the detainee] to a police station for questioning, or to the back of a police vehicle for questioning," *Lopez-Medina*, 461 F.3d at 740 (citations omitted).    As for "investigative means," the Supreme Court has held that officers should employ the "least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time."  *Florida v. Royer*, 460 U.S. 491, 500 (1983).  And transportation to a different location or to the back of a police vehicle for questioning often precedes a finding of a formal arrest. *See Lopez-Medina*, 461 F.3d at 740; *United States v. Obasa*, 15 F.3d 603, 608 (6th Cir. 1994).

Under the totality of the circumstances, the Court finds that Pacheco's continued detention ripened into an arrest requiring probable cause.  Start with the length of the detention: following the traffic stop, Pacheco was forced into the back of a sheriff's cruiser for over an hour while Agent Myers questioned him and tried to obtain consent to search his home. This amounted to more than a mere investigative detention, because "[g]enerally, a detention involves no more than a brief stop, interrogation and, under proper circumstances, a brief check for weapons."  *See Vargas Ramirez*, 93 F. Supp. 3d at 1219 (quotation omitted) (holding that immigration-related "seizure [which] lasted approximately one hour" constituted formal arrest).

Consider also Pacheco's transportation—first to the back of the sheriff's cruiser for questioning, and then back to his home for even more.  This too shows that Pacheco was arrested and not merely detained for a brief investigation.  *Id.* at 1220; *see Obasa*, 15 F.3d at 608-09 (holding that roadside detention transformed into formal arrest when officers transported detainee away from scene for questioning without any explanation).  Roadside safety may have been important here, but that does not explain the detour to Pacheco's home.

33

As for the manner of the detention and the "investigative means" employed, Agent Myers admitted that his goal was investigating suspected drug and gun trafficking—*not* verifying or dispelling his suspicions about Pacheco's immigration status. (Doc. 40, PageID 213-14, 227). That investigation and determination could wait, in Agent Myers's mind, until his criminal investigation was complete. (*Id.*). Surely hauling Pacheco to his home and trying to obtain consent to search it were not the "least intrusive" or most expeditious means to verify his status as a potentially unlawful alien. *See Royer*, 460 U.S. at 500; *see also Obasa*, 15 F.3d at 607 ("When police actions go beyond checking out the suspicious circumstances that led to the original stop, the detention becomes an arrest that must be supported by probable cause.").

Pacheco, moreover, was detained in the back of the sheriff's cruiser, and lacked all freedom of movement, further showing a full-fledged arrest. *See United States v. Richardson*, 949 F.2d 851, 857-58 (6th Cir. 1991) ("Placing Richardson in the police cruiser . . . also crossed the line into an arrest. Richardson was moved from his car to another location, and his freedom of movement was severely restricted.").

Finally, though not controlling, both Agent Myers and Officer Salmon referred to Pacheco's detention as an "arrest" and contended that they read Pacheco his *Miranda* rights upon returning to his home. (Doc. 40, PageID 171 ("Once we got off the freeway, I started talking to [Pacheco]. And I specifically told him that he was being detained at that point for immigration offenses and that he would be arrested for that. And then I read him his rights, provided him with his *Miranda* warnings . . . ."); *id.* at 303-04 (agreeing that Pacheco "was under arrest" by "the time [they] were at his apartment complex"); Doc. 41, PageID 475 ("I told him he was under arrest. He had asked me . . . if he was in trouble. And I did tell him, [y]es, you are. I said, [y]ou are under arrest for immigration violations . . . .")).

34

Under these circumstances, Pacheco's continued detention following the traffic stop amounted to a full-fledged arrest, thus requiring probable cause to believe he was (1) unlawfully present in the United States and (2) likely to escape before Agent Myers could obtain a warrant for his arrest. *See Quintana*, 623 F.3d at 1241 (asking whether officer "had 'reason to believe' (i.e., probable cause to believe) that the [arrestee] was an alien subject to deportation . . . . [and] likely to escape before a warrant [could] be obtained" in assessing lawfulness of "a warrantless 'administrative' arrest for deportation proceedings under 8 U.S.C. § 1357(a)(2)"); *see also Morales*, 793 F.3d at 216 ("It is beyond debate that an immigration officer . . . would need probable cause to arrest and detain individuals for the purpose of investigating their immigration status."); *Vargas Ramirez*, 93 F. Supp. 3d at 1221-22 (same).

2.  The Officers Lacked Probable Cause to Make a Warrantless Arrest Under § 1357(a)(2) Because the Government Put Forth no Evidence that Pacheco Posed a Risk of Escape.

Assuming that the ICE officers had "reason to believe" (i.e., probable cause) that Pacheco was present in the United States unlawfully, they nevertheless lacked authority to make a warrantless arrest under § 1357(a)(2) because the Government put forth no evidence that Pacheco posed a risk of escape. *See* 8 U.S.C. § 1357(a)(2).

ICE officers may make warrantless arrests for suspected immigration violations only when they have reason to believe "that the alien so arrested . . . *is likely to escape before a warrant can be obtained for his arrest*." *Id.* (emphasis added).  This flight-risk determination is not mere verbiage.  The Supreme Court held officers to this constraint in *Arizona v. United States*, 132 S. Ct. 2492 (2012).  There, the Court found that Arizona's enforcement statute was preempted because it purported to give Arizona law enforcement unlimited warrantless arrest authority, exceeding ICE's own warrantless arrest authority, which is limited to situations when there is a likelihood of escape before a warrant can be obtained.  *Id.* at 2505-07.

35

Therefore, ICE officers may make warrantless arrests for suspected immigration violations only when they have both probable cause for the arrest *and* probable cause that the subject is likely to escape.  *De La Paz v. Coy*, 786 F.3d 367, 376 (5th Cir. 2015) ("[E]ven if an agent has reasonable belief, before making an arrest, there must also be a likelihood of the person escaping before a warrant can be obtained for his arrest."); *Westover v. Reno*, 202 F.3d 475, 480 (1st Cir. 2000) (finding arrest was "in direct violation" of § 1357(a)(2) because "[w]hile INS agents may have had probable cause to arrest Westover . . . there is no evidence that Westover was likely to escape"); *Mountain High Knitting, Inc. v. Reno*, 51 F.3d 216, 218 (9th Cir. 1995) (holding that arrests under § 1357(a)(2) require an individualized determination of flight risk); *United States v. Cantu*, 519 F.2d 494, 496-97 (7th Cir. 1975) (same).

Here, the Government introduced *no* evidence that Pacheco posed a risk of escape.  This was not a situation where, for example, the officers were empowered to make a warrantless arrest because an alien "attempt[ed] to evade custody," *Contreras v. United States*, 672 F.2d 307, 309 (2d Cir. 1982), or "was looking for an opportunity to run," *United States v. Meza-Campos*, 500 F.2d 33, 34 (9th Cir. 1974) (per curiam), or was speeding cross-country in a car that belonged to someone else, *Quintana*, 623 F.3d at 1238.  To the contrary, the record shows that Pacheco was arrested just a few miles from his home (Doc. 40, PageID 301); that he lacked any known criminal history (*id.* at 171-74, 305); and that he answered the officers' questions without incident (*id.* at 171).  Pacheco, moreover, had a stable job as a painter (Doc. 41, PageID 427-28); lived with his fiancé, Daisy (*id.* at 440-41); helped pay the rent on their home (*id.* at 446); and helped her raise her two kids (*id.* at 426-27).  Under these circumstances, the Government failed to meet its burden to show probable cause that Pacheco was likely to escape before a warrant could be obtained.  *United States v. Khan*, 324 F. Supp. 2d 1177, 1187 (D. Colo. 2004).

Because the ICE officers lacked "reason to believe" Pacheco posed a risk of escape before they could obtain an administrative arrest warrant for his removal proceedings, his warrantless arrest violated 8 U.S.C. § 1357(a)(2). *See, e.g.*, *Arizona*, 132 S. Ct. at 2506 ("[ICE officers] may arrest an alien for being in the United States in violation of any [immigration] law or regulation, . . . but *only* where the alien 'is likely to escape before a warrant can be obtained." (emphasis added) (quotation omitted)); *Khan*, 324 F. Supp. 2d at 1187 (holding that "Khan's arrest was in violation of 8 U.S.C. § 1357(a)(2)" due to government's failure to show risk of escape).

### 3.  Suppression Is Warranted Under the Fourth Amendment Because the Government Did Not Show Probable Cause of an Independent Felony Offense.

Although the ICE officers violated 8 U.S.C. § 1357(a)(2) by arresting Pacheco without probable cause that he posed a risk of escape, that statutory violation—standing alone—does not merit suppression of the derivative evidence the officers obtained.  *See United States v. Abdi*, 463 F.3d 547, 555-57 (6th Cir. 2006).  Nevertheless, suppression *is* warranted here, because the ICE officers lacked probable cause to believe that Pacheco committed an independent felony offense justifying his warrantless arrest.  *Id.* at 557 n.13.

*United States v. Abdi* controls this case.  In *Abdi*, two ICE officers made a warrantless arrest of a suspected terrorist for alleged immigration violations under 8 U.S.C. § 1357(a)(2). *Id.* at 552, 558.  Over the next several weeks, federal law-enforcement officers took turns interrogating Abdi about his alleged terrorist involvement.  *Id.* at 552-54.  On the basis of the statements he provided during those sessions and other evidence that investigators uncovered, Abdi was indicted for several criminal offenses involving providing material support to terrorists.  *Id.* at 554.  Abdi then contested his warrantless arrest and moved to suppress all statements and other evidence seized in violation of the Fourth Amendment.  *Id.*

The district court conducted a suppression hearing on Abdi's motion. *Id.* at 554. After hearing the evidence, the court concluded that the Government "had probable cause to believe that Abdi was a national security risk, as defined by 8 U.S.C. § 1182, and therefore, had probable cause to execute an administrative arrest" under § 1357(a)(2) based on a suspected immigration violation. *Id.*; *see also* 8 U.S.C. § 1182(a)(3)(B)(iv)(ll) (making those aliens who "prepare or plan a terrorist activity" inadmissible to the United States). Nevertheless, the district court determined "that the Government failed to demonstrate that Abdi was 'likely to escape' on the day he was arrested or that exigent circumstances required an immediate arrest without a warrant." *Abdi*, 463 F.3d at 554. Therefore, the district court "found that Abdi's arrest by ICE agents without an administrative warrant violated 8 U.S.C. § 1357(a)(2)." *Id.* The district court then held that any statements Abdi made after his unlawful arrest but before he met with an attorney several weeks later must be suppressed. *Id.* at 554-55.

On appeal, the Government first argued that, even if the district court were correct in concluding that the ICE officers violated § 1357(a)(2) when they arrested Abdi without a warrant, "there is no basis for application of the exclusionary rule" based solely on that statutory violation. *Id.* at 555. The Sixth Circuit assumed, without deciding, that the district court was correct in finding the lack of a risk of escape, *id.* at 549 n.1, but nevertheless agreed with the Government that a statutory violation of § 1357(a)(2), standing alone, does not warrant suppression through application of the exclusionary rule, *id.* at 555-57. The court held that because "nothing in the text of 8 U.S.C. § 1357 provides an independent statutory remedy of suppression," the district court "erred in reading such a remedy into the statute . . . . [and] in suppressing Abdi's statements and the derivative evidence" obtained as a result of "the Government's failure to comply with the statute." *Id.* at 557.

The Sixth Circuit, however, explicitly based its holding "on the specific facts before the court" and took care to "emphasize" that "the outcome would be different if the Government's warrantless arrest had not [otherwise] complied with the Fourth Amendment," as discussed later in the opinion. *Id.* at 557 n.13. Thus, *Abdi* did not announce a blanket rule barring application of "the exclusionary rule" for "violation[s] of 8 U.S.C. § 1357." *Id.* Instead, *Abdi* simply adopted the Government's two-pronged argument that, in *that case*, suppression was not warranted because the Government had an independent basis for the warrantless arrest—namely, probable cause of an independent felony offense. *Id.* at 557 & n.13. Indeed, the Sixth Circuit first based its holding regarding the exclusionary rule on the Government's "compli[ance] with the Fourth Amendment, as discussed in Section III.C. of this opinion." *Id.* at 557 n.13. In its very next breath, the court then outlined (and later adopted) the Government's argument that the district court should be reversed, regardless of the statutory violation, "because the arrest was conducted in a public place and supported by probable cause [of a felony], and therefore the Government was not required to obtain a warrant to comply with the Fourth Amendment." *Id.* at 557.

*Abdi*, therefore, stands for three propositions, none of which is controversial. *First*, ICE officers may make a warrantless arrest, notwithstanding their statutory grant of authority in § 1357(a)(2) and its accompanying limitations, whenever "the arrest is in public and there is probable cause to believe that a *criminal offense* has been or is being committed." *See id.* (emphasis added) (citation omitted); *see also* 8 U.S.C. § 1357(a)(5). When officers make arrests under these circumstances, they comply with the Fourth Amendment, and the exclusionary rule does not bar derivative evidence, even if the officers failed to comply with § 1357(a)(2). *Abdi*, 463 F.3d at 562. But probable cause for a *criminal* violation is essential.

*Second*, the officers' subjective intent in making such a warrantless arrest is irrelevant to the inquiry.  *Id.* at 558-59.  That is, even if ICE officers make a warrantless arrest for supposed immigration violations *without* complying with § 1357(a)(2), the arrest remains lawful under the Fourth Amendment so long as "the arresting officers possessed knowledge of evidence sufficient to establish probable cause that [the arrestee] was engaged in the commission of a felony."  *Id.* at 559.  In *Abdi*, for example, the arrest was lawful even though the officers made the arrest for an immigration violation (but failed to comply with § 1357(a)(2)), because they *also* possessed knowledge sufficient to establish probable cause for a felony offense—namely, providing material support to terrorists.  463 F.3d at 560.

*Third*, the exclusionary rule presumptively applies when ICE officers: (1) make a warrantless arrest for suspected immigration violations under § 1357(a)(2); (2) fail to establish probable cause that the arrestee posed a risk of escape; and (3) otherwise lack probable cause to believe that a felony offense has been or is being committed.  *Id.* at 557 & n.13 ("Although we hold that application of the exclusionary rule is not appropriate for the Government's statutory violation of 8 U.S.C. § 1357 *in this case*, we emphasize that this decision is based on the specific facts before the court.  Specifically, we note that *the outcome would be different* if the Government's warrantless arrest had not complied with the Fourth Amendment . . . ." (emphasis added)); *see also, e.g.*, *Khan*, 324 F. Supp. 2d at 1187 (granting motion to suppress because "Khan's arrest was in violation of 8 U.S.C. § 1357(a)(2), and Khan was seized in violation of his Fourth Amendment right to be secure in his person against unreasonable seizures"); *United States v. Ravelo-Rodriguez*, No. 3:11-cr-70, 2012 WL 1597390, at *18-23 (E.D. Tenn. March 12, 2012) (looking for probable cause of an independent criminal offense), *rep. & recommendation adopted*, 2012 WL 1598074 (E.D. Tenn. May 7, 2012).

This framework makes sense given the *civil* nature of most immigration offenses. As the Supreme Court explained, "[a]s a general rule, it is not a crime for a removable alien to remain present in the United States." *Arizona*, 132 S. Ct. at 2505. Rather, "an alien who is illegally present in the United States . . . [commits] only a civil infraction." *Martinez-Medina v. Holder*, 673 F.3d 1029, 1036 (9th Cir. 2011) (quotation omitted). If law-enforcement officers "stop someone based on nothing more than possible removability, the usual predicate for an arrest is absent." *Arizona*, 132 S. Ct. at 2505. That is why immigration officers may make warrantless arrests for all suspected immigration violations, including mere civil infractions, "but only where the alien is likely to escape before a warrant can be obtained." *Id.* at 2506 (quotation omitted); *see also Abdi*, 463 F.3d at 568 n.6 (Cole, J., dissenting) (explaining that, if the "warrantless arrest [*had*] *satisfied* [8 U.S.C. § 1357(a)(2)], I would presume the constitutionality of the statute and join the majority in holding that there was no Fourth Amendment violation").

Here, as in *Abdi*, the suppression issue turns on whether the ICE officers had "probable cause to believe that a *criminal* offense [had] been or [was] being committed"—i.e., something more than Pacheco's mere unlawful presence in the United States. *See Abdi*, 463 F.3d at 557. Though not determinative of that issue, the Court notes that Agent Myers conceded he arrested Pacheco "for immigration offenses"—not for criminal violations. (Doc. 40, PageID 171-73). And Officer Salmon confirmed that they continued to hold Pacheco for a suspected "immigration violation"—namely, "[b]eing present without admission in the United States." (*Id.* at 303-04). This makes sense given that the traffic stop revealed no drugs or firearms (*id.* at 204-05), the mobile fingerprint exam uncovered no past criminal activity or active warrants (*id.* at 214), and the only evidence of criminal activity that Agent Myers had was an uncorroborated tip from a confidential informant that Pacheco was dealing drugs and guns (*id.* at 213).

41

The Government, moreover, argued that Pacheco's continued detention was lawful based solely on a suspected immigration violation—namely, his unlawful presence in the United States. (Doc. 43, PageID 502 ("The critical information gained at the traffic stop consisted of definitive information that the Defendant was in the country illegally. Special Agent Myers then used his discretion to detain the defendant *as he was unlawfully in the United States . . . .*") (emphasis added); *id.* at 503 ("Thus, the major shift in the traffic stop was the definitive information that the Defendant was in the United States illegally, allowing Special Agent Myers the ability to detain the Defendant.")). In short, the Government concedes that Agent Myers had no more probable cause of a suspected criminal offense immediately preceding Pacheco's arrest than Agent Myers had before the traffic stop. (*See id.* at 502 ("Thus, in the pre-traffic stop period, the allegation[s] of the confidential informant that the Defendant was a[n] [illegal] drug and . . . arms dealer, without more, was insufficient for a warrant . . . .")).

Under the totality of the circumstances, the Court concludes that the ICE officers lacked probable cause that *criminal* activity was afoot when they arrested Pacheco. Pacheco may have admitted to being in the country without permission, but that information, standing alone, does not provide probable cause that he had committed, or was committing, a crime. *E.g.*, *Arizona*, 132 S. Ct. at 2505; *Santos v. Frederick Cnty. Bd. of Comm'rs*, 725 F.3d 451, 465 (4th Cir. 2013) ("Because civil immigration violations do not constitute crimes, suspicion or knowledge that an individual has committed a civil immigration violation, by itself, does not give a law enforcement officer probable cause to believe that the individual is engaged in criminal activity."); *United States v. Garcia-Rivas*, 520 F. App'x 507, 509 (9th Cir. 2013) (per curiam) ("Our law is clear that illegal presence in the country is not sufficient to support a finding of probable cause of suspected criminal activity." (collecting cases)).

At bottom, the exclusionary rule presumptively applies to any evidence obtained as a result of Pacheco's unlawful seizure because the ICE officers: (1) arrested Pacheco without a warrant for a civil immigration offense under § 1357(a)(2); (2) failed to establish probable cause that Pacheco posed a risk of escape before a warrant for his arrest could be obtained; and (3) otherwise lacked probable cause to believe that a *criminal offense* had been or was being committed.[11]  *See Abdi*, 463 F.3d at 557 n.13; *Khan*, 324 F. Supp. 2d at 1187.

### D.  The Court Must Suppress any Derivative Evidence Obtained as a Result of Pacheco's Unlawful Seizure Under the "Fruit of the Poisonous Tree" Doctrine.

Because Pacheco's warrantless arrest violated 8 U.S.C. § 1357(a)(2) and the Fourth Amendment, the Court must suppress any "evidence later discovered and found to be derivative of [that] illegality" under the exclusionary rule as "so-called [tainted] 'fruit of the poisonous tree.'"  *See Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016) (quotation omitted); *Brown v. Illinois*, 422 U.S. 590, 600-05 (1975) (discussing the attenuation doctrine); *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963) (holding that fruit of the poisonous tree doctrine applies to both physical evidence and verbal statements).

---

[11] Pacheco also argued that his arrest was unlawful under a departmental policy memorandum issued by Secretary of Homeland Security Jeh Johnson.  *See* Jeh Johnson, Dep't of Homeland Sec., Policies for the Apprehension, Detention and Removal of Undocumented Immigrants (Nov. 20, 2014) ("DHS Memo").  Because the Court finds Pacheco's arrest unlawful for other reasons, the Court need not rule on this argument.  Nevertheless, for the sake of completeness, the Court *will* rule on Pacheco's alternate argument and reject it.  The Court has, on past occasions, denied motions to suppress based on alleged violations of discretionary departmental guidance where, as here, the guidance does not create or confer any rights on individuals and, in any event, the officers' conduct seemingly complied with the guidance. *See United States v. Ledbetter*, No. 14-cr-127, 2015 WL 7017367, at *7-8 (S.D. Ohio Nov. 12, 2015).

So too here.  The DHS Memo focuses entirely on how to exercise prosecutorial *discretion* in immigration matters.  DHS Memo at 1-6.  And while the memo establishes different enforcement priorities, the memo also states that "[n]othing in the memorandum should be construed to prohibit or discourage the apprehension, detention, or removal of aliens unlawfully in the United States who are not identified as priorities herein."  *Id.* at 5.  Finally, the memo explicitly states that "[t]hese guidelines and priorities are not intended to, do not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter."  *Id.* at 6.  Under these circumstances, Pacheco's alternate argument fails.  *See Ledbetter*, 2015 WL 7017367, at *7-8 (denying motion to suppress based on similar arguments).

The "exclusionary rule" serves as the primary means for deterring violations of the Fourth Amendment. *Strieff*, 136 S. Ct. at 2061. When applicable, the exclusionary rule bars use of both "primary evidence" obtained as a direct result of an illegal search or seizure and evidence later discovered and found to be derivative of an unlawful search or seizure—the so-called "fruit of the poisonous tree." *Id.* As the Sixth Circuit has explained, "[t]he driving force behind the rule, for the last half century, has been deterrence—to discourage the police from violating the Fourth Amendment by prohibiting them from leveraging illegal encounters into criminal convictions." *United States v. Clariot*, 655 F.3d 550, 553 (6th Cir. 2011). Under this rationale, "the police will be discouraged from crossing Fourth Amendment lines in the first place" if courts "suppress evidence of wrongdoing discovered through illegal searches and seizures." *Id.* (citing *Wong Sun*, 371 U.S. at 488).

Application of the exclusionary rule is not automatic. The "deterrence rationale" limits the rule's reach in two ways. *First*, "[e]vidence will not be excluded . . . unless the illegality is at least the 'but for' cause of the discovery of the evidence . . . ." *Clariot*, 655 F.3d at 553 (quotation omitted). After all, "there is little to deter if the officers' conduct is not the 'unattenuated causation' of the evidentiary discovery." *Id.* (quotation omitted). *Second*, "but-for causality is only a necessary, not a sufficient, condition for suppression." *Id.* at 553-54 (quotation omitted). In addition to showing but-for causation, "a criminal suspect invoking the exclusionary rule must show that its deterrence benefits outweigh its substantial costs." *Id.* at 554 (quotation omitted); *see also United States v. Figueredo-Diaz*, 718 F.3d 568, 574 (6th Cir. 2013) ("[E]ven if recovered evidence *is* the product of illegality, it will be suppressed only where doing so yields deterrence benefits that sufficiently outweigh the substantial social costs associated with exclusion.").

44

In this case, the exclusionary rule applies because Pacheco's unlawful seizure formed the "but-for" cause of the ICE officers' evidentiary discoveries and because the deterrence benefits outweigh any social costs in excluding that evidence.

1.  "But For" Pacheco's Unlawful Seizure, the ICE Officers Would Not Have Discovered the Guns and Ammunition or Obtained Pacheco's Admission to Possessing a Firearm.

The Supreme Court recognizes several exceptions to the exclusionary rule that "involve the causal relationship between the unconstitutional act and the discovery of evidence." *Strieff*, 136 S. Ct. at 2016.  The first exception, "the independent source doctrine," permits courts "to admit evidence obtained [unlawfully] if officers independently acquired it from a separate, independent source." *Id.*  The second exception, "the inevitable discovery doctrine," permits "admission of evidence that would have been discovered even without the unconstitutional source." *Id.*  And the third exception "is the attenuation doctrine," under which "[e]vidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance." *Id.* (quotation omitted). Here, only the third exception arguably applies.

To determine whether the "attenuation doctrine" breaks the causal chain between Pacheco's unlawful seizure and discovery of the evidence he seeks to suppress, the Court looks to four factors articulated in *Brown v. Illinois*, 422 U.S. 590 (1975).  Those factors include the length of time between the seizure and discovery of the evidence, the presence of intervening circumstances, the purpose and flagrancy of the official misconduct, and whether the officers read Pacheco his *Miranda* rights before he consented to the home search or made an admission regarding possession of a firearm.  *See Strieff*, 136 S. Ct. at 2061-62; *United States v. Lopez-Arias*, 344 F.3d 623, 630 (6th Cir. 2003).  The Government bears the burden of persuasion on this issue.  *Lopez-Arias*, 344 F.3d at 630.

45

Here, there was no "break" in the causal chain. Pacheco was unlawfully seized roughly twenty minutes after the traffic stop (around 7:15 a.m.), and his continued interrogation and the home search, which began almost immediately afterward, lasted until roughly 8:30 a.m. Pacheco remained in the back of the sheriff's cruiser the entire time, and he did not consult with an attorney prior to consenting to the search or making the admission. Under these circumstances, and even crediting, for the sake of argument, the Government's version of events—i.e., that Agent Myers provided *Miranda* warnings *before* obtaining Pacheco's consent or admission—the attenuation doctrine does not apply. *See id.* (collecting cases).

In *Brown*, for example, "the Supreme Court held that a separation of less than two hours between an illegal arrest and a voluntary statement was insufficient to break the causal chain between the two when no intervening event of significance had occurred." *Id.* (citing *Brown*, 422 U.S. at 604). And in *United States v. Buchanan*, 904 F.2d 349 (6th Cir. 1990), the Sixth Circuit held that the taint of an illegal seizure was not purged when only an hour had passed between the illegal seizure and the time the defendant gave his consent to search, *id.* at 356. The *Buchanan* Court also emphasized that the defendant did not move from his location of initial detention and "did not consult with an attorney prior to consenting to the search," the latter of which forms a "crucial factor" in the attenuation analysis. *Id.* (quotation omitted). Because "[d]issipation of the taint resulting from an illegal [seizure] ordinarily involves showing that there was some significant intervening time, space, or event," and none was present here, the first two factors from *Brown* weigh in favor of suppression. *See Lopez-Arias*, 344 F.3d at 630 (quotation omitted); *see also United States v. Griffith*, 193 F. App'x 538, 542 (6th Cir. 2006) (holding that consent "was the fruit of [defendant's] arrest" and that "there were no intervening circumstances that would break that chain of causation" under analogous facts).

Turning to the third factor—the purpose and flagrancy of the misconduct—the Court finds that "the illegality of [Pacheco's] arrest was blatant." *See Lopez-Arias*, 344 F.3d at 630; *see also Richardson*, 949 F.2d at 859 (finding that placing a suspect into the back of a police car for twenty minutes without probable cause constituted a blatant constitutional violation). This illegality, "moreover, had a quality of purposefulness," because Agent Myers conceded that he arrested Pacheco on a suspected immigration violation to further a criminal investigation. *See Brown*, 422 U.S. at 605 (finding purposefulness behind unlawful arrest where detectives "virtually conceded" that they made arrest "'for investigation' or 'for questioning'"). Here too, "[t]he arrest, both in design and in execution, was investigatory." *Id.* Arresting Pacheco and hauling him back to his home in the hope of obtaining his consent to search for drugs and guns was more than mere negligence, and this too suggests suppression is the appropriate remedy. *See United States v. Waller*, 105 F. Supp. 3d 863, 699 (W.D. Tex. 2015).

Finally, the Court notes that even if Agent Myers read Pacheco his *Miranda* rights first, as the Government contends, "this alone was insufficient to break the causal chain between the illegal arrest and [Pacheco's] consent" and admission. *See Lopez-Arias*, 344 F.3d at 630 (citing *Kaupp v. Texas*, 538 U.S. 626, 633 (2003) (per curiam)); *United States v. Delano*, 543 F. Supp. 2d 791, 805-06 (N.D. Ohio 2008) (suppressing statements made after unlawful arrest despite *Miranda* warnings because "[a]t most, [defendant] made this statement an hour after she arrived at the jail" and no other intervening circumstances occurred). The Supreme Court has declined to view *Miranda* warnings as the *sine qua non* for breaking the chain of causation, so this Court will continue to view those warnings as but one "important" factor in the analysis. *See Brown*, 422 U.S. at 603. Standing alone, any *Miranda* warnings provided to Pacheco do not purge the taint of his unlawful seizure. *Lopez-Arias*, 344 F.3d at 630.

2.  The Deterrence Benefits of the Exclusionary Rule Outweigh the Social Costs in
Suppressing the Challenged Evidence.

For the exclusionary rule to apply, the Court also must determine whether the deterrence benefits outweigh the social costs of excluding the firearms and ammunition seized from Pacheco's home and Pacheco's admission that he possessed a firearm.  *Herring v. United States*, 555 U.S. 135, 141 (2009); *Hudson v. Michigan*, 547 U.S. 586, 594-99 (2006).

Here, that task is simple.  The deterrence benefit of suppressing the evidence will "ensure that an occupant's right to privacy [in his home] is protected, and that his . . . dignity [will be] preserved."  *See United States v. Thompson*, 667 F. Supp. 2d 758, 768 (S.D. Ohio 2009).  These twin concerns will grow more important, not less, as immigration plays an increasingly central and vitriolic role in our public discourse.  The Court, therefore, finds great deterrence benefit in ensuring that law-enforcement officers know the bounds of their authority under the Fourth Amendment and federal immigration law.  *See United States v. Toledo*, 615 F. Supp. 2d 453, 464 n.5 (S.D. W. Va. 2009) (holding that deterrence benefits "are clear" in criminal cases involving immigration law "[g]iven Congressionally mandated restrictions" on law-enforcement power). Suppressing the tainted evidence in this case will help demarcate those bounds and deter future unlawful conduct directed at suspected aliens.

The social cost in suppressing the tainted evidence, moreover, does not outweigh the important deterrence benefits discussed above.  For one thing, the cost of excluding evidence will come into play in *every* suppression motion.  *See Thompson*, 667 F. Supp. 2d at 768. For another, the social cost of excluding the evidence is "minimal" since Pacheco presumably is "still subject to deportation."  *See Toledo*, 615 F. Supp. at 464 n.5 (granting motion to suppress) ("[S]ince Defendant is still subject to deportation, the social cost of enforcing this [suppression] policy is minimal.").

48

**E.  Pacheco's Alternative Arguments for Suppression Lack Merit Because the Court Finds the Government's Witnesses More Credible.**

As explained, the Court must suppress the firearms and ammunition seized from Pacheco's home, as well as his admission to possessing a firearm, under the tainted fruit of the poisonous tree doctrine.  Pacheco's seizure following the roadside stop was unlawful, no intervening events "purged" the taint of that illegality, and the deterrence benefits outweigh the social costs of suppression.

Pacheco argues, however, that suppression remains an appropriate remedy even if his seizure following the roadside stop *was* lawful.  (Doc. 44, PageID 519-26).  More specifically, he argues that because, under his version of events, he did not receive *Miranda* warnings until after the ICE officers already searched his home, he did not voluntarily consent to the search or freely make the incriminating admission.  As Pacheco acknowledges—these arguments hinge on a factual dispute over when the ICE officers first provided *Miranda* warnings and over how coercive the officers were in seeking consent to search his home.  (*Id.* at 522).  In other words, Pacheco's alternative arguments depend on which witnesses were more credible.

Although this credibility determination presents a close call, the Court concludes that the ICE officers' version of events outside Pacheco's home seems more believable.  Agent Myers testified unequivocally that he provided *Miranda* warnings to Pacheco when they first returned to his home following the traffic stop—before ever broaching the subject of searching his home or questioning Pacheco about the presence of guns or drugs.  (Doc. 40, PageID 171, 177, 216).  Officer Salmon agreed with this timeline.  (*Id.* at 301-02).  Agent Myers also testified that Pacheco (and his fiancé, Daisy) freely consented to the search after the agents answered their preliminary questions over why they wanted to search the residence.  (*Id.* at 179-83, 216-18).  Officer Salmon confirmed Agent Myers's version of events.  (*Id.* at 301-02, 309).

49

Pacheco submitted an affidavit in support of his motion to suppress in which he claimed that the officers did not advise him of his *Miranda* rights until after they searched his home and that they badgered him over consenting to the search. (Doc. 32, PageID 105). But Pacheco declined to testify during the suppression hearing, thereby denying the Government any ability to cross-examine him. Under these circumstances, the Court cannot place much weight on his affidavit. *See Ramos*, 591 F. Supp. 2d at 113-14 (affording "little weight" to statements from defendant who did not testify at suppression hearing).[12]

Marroquin did testify, and he contradicted the ICE officers' timeline regarding the *Miranda* warnings. (Doc. 41, PageID 400-05). Marroquin, who was sitting next to Pacheco in the back of the sheriff's cruiser, insisted that the officers did not advise Pacheco of his *Miranda* rights before entering his home. (*Id.*). But Marroquin also testified that he was not paying close attention because he was "distracted" by his brother's arrest. (*Id.* at 406-07). And Marroquin's version of events differs in critical ways from Pacheco's. For example, Pacheco averred that he consented to the home search and *then* admitted to possessing a firearm. (Doc. 32, PageID 105). Marroquin, however, testified the other way around—i.e., that Pacheco first admitting to possessing a gun and *then* consented to a search of his home. (Doc. 41, PageID 402, 407-08). Later still, Marroquin clarified that he was not sure if Pacheco *ever* consented to the officers searching his home. (*Id.* at 408). The Court places less weight on Marroquin's testimony given these internal inconsistences, the inconsistencies with Pacheco's version of events as well as with the ICE officers' version of events, and Marroquin's admission that he was distracted at the time. For what it's worth, the Government also notes that Marroquin has been convicted of a felony for providing a false statement in connection with a passport application. (*Id.* at 413).

---

[12] In fact, some courts will not consider a defendant's affidavit at all if he refuses to testify at the suppression hearing. *See United States v. Polanco*, 37 F. Supp. 2d 262, 264 & n.4 (S.D.N.Y. 1999).

Pacheco's fiancé, Daisy, testified at the suppression hearing too.  But she spent the morning haggling with Agent Myers at her doorstep (*id.* at 442-44), so she could not have known when, if ever, the ICE officers provided *Miranda* warnings to Pacheco.  Her testimony thus sheds no light on the matter.  Daisy also testified that Agent Myers seemed insistent on searching her home.  (*Id.*).  But this portion of her testimony largely tracks Agent Myers's testimony regarding their interactions that morning (Doc. 40, PageID 216-18), and, in any event, she later signed a consent-to-search form, thereby suggesting that she freely allowed the officers inside her home (Doc. 41, PageID 450).  At the end of the day, her testimony does not controvert Agent Myers's testimony in any material respect.

In sum, the Court finds the testimony of Agent Myers and Officer Salmon more credible than that of Marroquin and Daisy, and certainly more credible than Pacheco's untested version of events.  Agent Myers exceeded the bounds of his authority when he interrogated Pacheco on the side of the road without first providing him *Miranda* warnings and when he arrested Pacheco without probable cause that he posed a risk of escape or that criminal activity was afoot.  But the Court doubts that Agent Myers (or Officer Salmon) would risk his career in law enforcement by lying under oath about the events outside Pacheco's home.  Accordingly, Pacheco's alternative grounds for suppression of the firearms, ammunition, and his admission to possessing a firearm must fail.

## IV. CONCLUSION

Law enforcement has been, and is likely to remain, an "often competitive enterprise." *See Johnson*, 333 U.S. at 14.  Zealous officers will do what they can to "ferret[] out crime" with the tools at their disposal, often "while acting under the excitement that attends the capture of persons accused of crime."  *Id.* at 14 & n.3 (quotation omitted).  This is understandable.

Our Constitution, however, wisely interposes neutral and detached judicial officers between predator and prey. *Id.* at 14. The Fourth and Fifth Amendments do most of this work, and as explained above, they apply with equal force to citizens and would-be citizens alike. Here, a pair of overzealous officers exceeded the limits those amendments impose, thus requiring suppression of Pacheco's un-*Mirandized* statements regarding his citizenship and immigration status, as well as the firearms and ammunition that the officers later discovered at his home, and Pacheco's admission to possessing a firearm.

For these reasons, and all the reasons set forth above, Pacheco's motion to suppress evidence (Doc. 28) is **GRANTED**. The Court likewise **GRANTS** Pacheco's motion to allow video testimony during the November 2016 suppression hearing (Doc. 37) and Pacheco's motion for an extension of time for the filing of motions in limine, proposed jury instructions, stipulations, witness lists, and exhibit lists (Doc. 47). A Superseding Scheduling Order will follow establishing a new trial date and deadlines for pretrial motions.

**IT IS SO ORDERED.**

      **s/ Algenon L. Marbley**
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED: December 29, 2016**